**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**DUSTIN L. BOWERS,**

      **Plaintiff,**

                                      **Civil Action 2:20-cv-2759**
                                      **Chief Judge Algenon L. Marbley**
     **v.**                               **Magistrate Judge Elizabeth P. Deavers**

**COMMISSIONER OF SOCIAL SECURITY,**

      **Defendant.**

## REPORT AND RECOMMENDATION

      Plaintiff, Dustin L. Bowers ("Plaintiff"), brings this action under 42 U.S.C. § 405(g) for review of a final decision of the Commissioner of Social Security ("Commissioner") denying Plaintiff's application for period of disability, disability insurance, and supplemental security income benefits. This matter is before the United States Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 17), the Commissioner's Memorandum in Opposition (ECF No. 22), and the administrative record (ECF No. 15). For the following reasons, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I. BACKGROUND

      Plaintiff applied for disability insurance benefits on January 17, 2012, alleging a disability beginning on December 10, 2011, and also applied for supplemental security income

1

benefits on April 3, 2012, alleging a disability beginning on August 30, 2009.  (R. at 195-212.)[1]

Plaintiff's application was denied, initially and upon reconsideration, and upon request an

administrative hearing was held on April 22, 2014, in which Plaintiff appeared and testified.  (R.

at 40-61, 130-155.)  On June 16, 2014, administrative law judge Amelia G. Lombardo issued a

decision finding that Plaintiff was not disabled.  (R. at 15-39.)  On September 18, 2015, the

Appeals Council denied Plaintiff's request for review and adopted administrative law judge

Lombardo's decision as the Commissioner's final decision.  (R. at 1-3.)  On November 17, 2015,

Plaintiff then commenced an action in this court.  *See Bowers v. Commissioner of Social*

*Security*, Case No. 2:15-cv-3004.  On July 21, 2016, upon joint motion of the parties, the Court

remanded the case pursuant to Sentence Four of 42 U.S.C. § 405(g).  (R. at 1073.)

> On January 3, 2017, following the Court's remand, the Appeals Council remanded the
>
> case for further evaluation of the opinions of consultative examiners and the State agency
>
> psychological consultants.  (R. at 1078-1081.)  On May 3, 2017, administrative law judge
>
> Elizabeth A. Motta held a second administrative hearing, in which Plaintiff appeared and
>
> testified.  (R. at 1038-1071.)  On August 16, 2017, administrative law judge Motta issued
>
> a decision finding that Plaintiff was not disabled.  (R. at 1002-1036.)  On April 2, 2019,
>
> the Appeals Council remanded the case again, for failure to comply with the Appeals
>
> Council's January 3, 2017 Order.  (R. at 1114-1118.)

---

[1] Plaintiff returned to work performing substantial gainful activity on September 22, 2014.
Accordingly, Plaintiff now seeks benefits for an alleged closed period of disability from August
30, 2009 through September 22, 2014.  (ECF No. 17 at PAGEID # 1688 ("Thus, the relevant
time period here is from August 30, 2009, the date [Plaintiff] claims to have become disabled,
and September 22, 2014, the date that [Plaintiff] began performing substantial gainful activity.").

On November 13, 2019, administrative law judge Gregory G. Kenyon ("the ALJ") held a third administrative hearing, in which Plaintiff did not appear but in which the ALJ and Plaintiff's counsel examined a medical expert, Jeffrey Andert, M.D. (R. at 947-959.) On January 16, 2020, the ALJ held a fourth administrative hearing, in which Plaintiff appeared and testified. (R. at 963-1001.) A vocational expert ("VE"), Karen Schneider, also testified. (*Id.*) On February 27, 2020, the ALJ issued a decision finding that Plaintiff was not disabled. (R. at 912-945.) On May 28, 2020, Plaintiff commenced the instant action. (ECF No. 1.)

## II. RELEVANT HEARING TESTIMONY

### A. Plaintiff's Testimony

Plaintiff appeared at and testified during the April 22, 2014, May 3, 2017, and January 16, 2020 administrative hearings. (R. at 40-61, 963-1001, 1038-1071.) First, at the April 22, 2014 hearing, Plaintiff testified that for a "couple of years" starting in 2006, he had worked for Aramark Sports and Entertainment as a dishwasher. (R. at 44.) Plaintiff also testified that he had most recently worked in 2012, in various roles at an assisted living facility. (R. at 46-47.) Plaintiff testified that he left that job because the employer needed someone who could work faster. (R. at 47.) Plaintiff also testified that he had received the job at the assisted living facility through a job coach, and that he had other jobs in the past with a job coach. (R. at 53-54.)

At the May 3, 2017 hearing, Plaintiff testified that his work at Aramark Sports and Entertainment was as a dishwasher at a restaurant named London Grill, and that he was a prep cook there as well. (R. at 1045.) Plaintiff also testified that he had worked at Giant Eagle since 2014. (*Id.*) At Giant Eagle, he attended grocery carts and worked in the deli, produce, and hot food departments as needed. (R. at 1046.) Plaintiff testified that he worked part-time at Giant

Eagle, between twenty and forty hours a week, and that his work also included waiting on customers. (*Id.*) Plaintiff testified that he couldn't work between 2009 and 2014 because he was slow and he has difficulty communicating with others which makes him frustrated. (R. at 1048.) Plaintiff testified that he took depression medication for six months between 2009 and 2014. (R. at 1048-1049.) Plaintiff also testified that he had worked with the Ohio Bureau of Vocational Rehabilitation ("BVR") since high school, and he had lost count of how many times he had worked with them. (R. at 1052-1053.) Plaintiff testified that the BVR would help him find a job, and when he had problems with that job he would contact the BVR and they would help him get a new job. (R. at 1053.) Plaintiff testified that at Giant Eagle, he called the BVR and they sent a job coach who helped Plaintiff focus on doing his job. (*Id.*) Plaintiff also testified that his depression never kept him from going to work. (R. at 1058.)

At the January 16, 2020 hearing, Plaintiff testified that he worked part-time as a dishwasher at a restaurant called the Corner Restaurant between August 2009 and September 2014. (R. at 972-973.) Plaintiff testified that he was presently working full-time, and he had been working part-time for three or four years before being offered a full-time position. (R. at 981.) Plaintiff testified that there was no change to his mental health that allowed him to work full-time, but rather that he became a full-time employee because his employer liked him and offered him the position. (*Id.*) Plaintiff testified that he presently was not working because of an eye problem, but that he anticipated returning to work once he recovered. (R. at 986.) Plaintiff testified that while at work, his supervisors direct or redirect him several times a day, and they help him to make sure the job is done. (R. at 986-987.) Plaintiff testified that the BVR provided a job coach when he started at Giant Eagle, and he worked with the job coach for about a year,

until he was full-time, and then for about three months.  (R. at 987.)  During the three month

period when the job coach helped him while he was working full-time, the job coach would

check on him at work once or twice a week, and would tell him what he was doing wrong and

how to improve.  (R. at 988-989.)  The job coach also would call Plaintiff to confirm that

Plaintiff was getting to work.  (R. at 989.)

**B.     Medical Expert's Testimony**

At the November 13, 2019 administrative hearing, Plaintiff's counsel and the

administrative law judge examined Jeffrey Andert, M.D., who testified as a medical expert.  (R.

at 951-959.)  Dr. Andert testified that he had not examined or treated Plaintiff, but he had

reviewed the medical evidence in the record, and there was sufficient evidence for him to have

an opinion as to Plaintiff's medical status.  (R. at 951-952.)  Specifically, Dr. Andert testified

that the record indicates the presence of an "unspecified depressive disorder," that Plaintiff has

"mild intellectual deficits" which would place Plaintiff "in the borderline range of measured

intelligence."  (R. at 952.)  Dr. Andert also noted Plaintiff's difficulties with written expression

and spelling.  (R. at 953.)  Dr. Andert reported that Plaintiff had been diagnosed with attention

deficit hyperactivity disorder ("ADHD"), but he "did not find the documentation of the necessary

symptoms and clinical data that would identify that as a severe impairment as an adult."  (*Id.*)

Finally, Dr. Andert noted that Plaintiff had been diagnosed with an impulse control disorder,

which Dr. Andert opined that "was specific to apparently particular incidents and there was no

other indication of continued impulsive behavior . . . that would meet the durational requirements

of a severe impairment."  (R. at 953-954.)  Dr. Andert therefore concluded that the record

5

documented that Plaintiff had three impairments: unspecified depressive disorder, borderline intellectual functioning, and a disorder of written expression. (R. at 954.)

Dr. Andert testified that the relevant listings for Plaintiff would be listings 12.02 and 12.11, and while the A listings would be met, the B listings would not be at listing level. (*Id.*) With respect to the B criteria, Dr. Andert testified that Plaintiff's ability to understand, remember, and apply information, combined with his borderline intellectual functioning and his learning difficulty in the area of written expression, would be a marked level of limitation. (*Id.*) Dr. Andert also found that Plaintiff would be moderately limited in his ability to interact with others, and that Plaintiff's concentration, persistence and pace would be moderately limited. (*Id.*) Dr. Andert testified that Plaintiff is capable of independent living. (R. at 954-955.)

As for Plaintiff's functional limitations, Dr. Andert found that Plaintiff would be completely limited to the most basic simple, routine and repetitive tasks, not more than one or two steps involving some degree of judgment prior to completion of the finished product. (R. at 955.) Dr. Andert testified that Plaintiff would be precluded from fast-paced work, and he would not be able to utilize or generate any type of written work product. (*Id.*) Dr. Andert also testified that he would limit Plaintiff to occasional contact with the general public, but Plaintiff is capable of a full range of interaction with coworkers and supervisors. (*Id.*) Dr. Andert testified that Plaintiff's ability to adapt to stress and change and be oriented to new tasks is only at the basic simple, routine and repetitive level of work complexity. (*Id.*)

Dr. Andert testified that Plaintiff would be capable of learning most tasks with the usual orientation process, particularly through demonstration. (R. at 956.) Dr. Andert also testified that any additional supervision may consist of intermittent oversight by a supervisor, maybe once

or so over the course of an eight hour shift, to observe Plaintiff's work performance and perhaps provide some feedback.  (*Id.*)  Dr. Andert then specifically addressed the opinion of Ms. Clark, Plaintiff's vocational supervisor, and said that he didn't believe that Ms. Clark recommended a job coach for Plaintiff as much as she recommended the daily oversight and redirection responsibilities that a part of a supervisor's job.  (*Id.*)  Dr. Andert added, however, that "I don't know how that compares with what a job coach would provide and a vocational expert may have more knowledge than I."  (*Id.*)

**C.     Vocational Expert's Testimony**

Ms. Karen Schneider testified as the VE at the January 16, 2020 administrative hearing. (R. at 992-999.)  Based on Plaintiff's age, education, and work experience and the residual functional capacity ultimately determined by the ALJ, the VE testified that a similarly situated hypothetical individual could perform the following jobs that exist in significant numbers in the national economy:  routing clerk, merchandise marker, and mail clerk.  (R. at 993.)

### III.  RELEVANT RECORD EVIDENCE

**A.     J. R. Clark, Jr., Psy.D.**

Plaintiff saw J. R. Clark, Jr., Psy.D., for a psychological evaluation report on December 2, 2010, so that Dr. Clark could provide "diagnostic clarification and [] offer comments regarding [Plaintiff's] vocational potential."  (R. at 577-588.)  Plaintiff's mother also attended the evaluation and provided additional information.  (*Id.*)  According to Dr. Clark, Plaintiff complained of a history of cognitive limitations, ADHD, and family conflict.  (R. at 577.) Plaintiff and Plaintiff's mother detailed Plaintiff's relevant history, including Plaintiff's history of suffering perinatal pulmonary distress with extreme cyanosis as a newborn, his

neurodevelopmental delays, his history of neurobehavioral problems and academic learning difficulties, and his employment history.  (R. at 584.)

Dr. Clark conducted testing of Plaintiff's intellectual abilities, academic skills, memory abilities, and neurobehavioral functioning, and assessed that Plaintiff's Full Scale IQ of 78 was "at the upper limit of the Borderline range and lower limit of the Low Average range . . . with a 95% level of confidence."  (R. at 581-584.)  Dr. Clark added that Plaintiff's scores were "noteworthy for average visual constructional skills and mental arithmetic problem solving abilities with low average vocabulary knowledge, visual analytic skills, and fund of semantic knowledge," but that Plaintiff's relative weaknesses "were clearly noted with much below average scores on [] subtests assessing [Plaintiff's] verbal conceptual thinking abilities, speed of visual scanning and speed and efficiency of psychomotor integration."  (R. at 585.)  Dr. Clark also found that Plaintiff's math computation skills, memory capabilities, and visual memory abilities were "average," that his whole word decoding skills were "low average," his spelling skills were "borderline," his reading skills were "extremely low to deficient," and his vocabulary knowledge was "below average to average."  (*Id.*)

Dr. Clark asked Plaintiff and Plaintiff's mother to each complete a Barkley Screening Checklist for ADHD, which Dr. Clark noted produced a "mixed pattern of results."  (R. at 585.) Specifically, Dr. Clark noted that Plaintiff's results were not consistent with the clinically diagnosable symptoms of ADHD, but that his mother's results were.  (*Id.*)  Dr. Clark wrote that "[b]ased on the information available [] it is difficult to sort out the extent to which [Plaintiff] is irresponsible, for example, in how he handles his money but it is clear that he has demonstrated extremely poor judgment in how he has related to females . . . and also some difficulties he had

8

when he was working at [a] restaurant." (R. at 586.) Dr. Clark then concluded that "the best way to sort out this complex clinical and diagnostic picture is through a combination of family and individual psychotherapy and psychiatric treatment with medication management." (*Id.*)

With regard to Plaintiff's ability to work, Dr. Clark opined that "[t]here is no question that [Plaintiff] is employable given his work history," but added that "[t]he challenge for [Plaintiff] is self-regulating his emotions and attending work on time and consistently so as to keep a job." (*Id.*) Dr. Clark wrote that "[t]he best way to determine what type of work [Plaintiff] can do is through on the job training," and that "[i]t is clear that his limitations in hand-eye coordination as well as difficulties multi tasking along with proneness to become easily frustrated, angry, and upset all indicate that he needs to work in a job that is fairly slow to moderate in pace, [where] he [can] focus[] on one task at a time, and is able to ask for help without being criticized." (R. at 586-587.) Dr. Clark then concluded that "[i]t is strongly recommended that [Plaintiff] work closely with a job coach to ensure a good fit between his job tasks and his performance," because "[t]o the extent [Plaintiff] has a job coach who can play serve [sic] as a mediator between him and management, his potential for keeping a job should greatly improve." (R. at 587.)

**B.    Lari Meyer, Ph.D.**

On June 28, 2012, Plaintiff saw Lari Meyer, Ph.D., for a disability assessment report. (R. at 753-763.) Plaintiff reported to Dr. Meyer that he was "[d]epressed all the time," and that ever since his mother passed away (four and a half months prior to the assessment), he was "stuck in a rut" and that he had symptoms of depression "almost every day," for a "majority of the day." (R. at 755.) Plaintiff complained of a lack of focus, bad speech, horrible handwriting, and a short

9

attention span, and he reported that he saw a psychiatrist but was not on medication.  (*Id.*)  Dr.

Meyer reviewed Plaintiff's history and noted that "[r]ecords provided indicate history of

diagnoses of Learning Disorder NOS and Cognitive Disorder NOS due to perinatal hypoxia."

(R. at 756.)  Plaintiff reported having worked at a kitchen, a factory, a warehouse, a grocery

store, and an assisted living facility, and that his longest job lasted four years.  (R. at 756-757.)

Dr. Meyer noted that Plaintiff "currently works part-time, approximately 20 hours per week . . .

and has done so for the past three months."  (R. at 757.)  Dr. Meyer also reviewed records of

Plaintiff's work history and noted that they "indicate a history of involvement with Ohio [BVR]

services, but [Plaintiff] does not provide [a] description of this today."  (*Id.*)

Dr. Meyer diagnosed Plaintiff with ADHD NOS, in partial remission, and forwarded

diagnoses of Cognitive Disorder NOS, Learning Disorder NOS, and Borderline Intellectual

Functioning.  (R. at 761.)  Dr. Meyer added that "[w]hile he does report somewhat episodic

symptoms of depression, it is also notable that current duration of symptoms during the day does

not meet diagnostic criteria for a major depressive episode."  (R. at 762.)  Dr. Meyer also

provided a functional assessment, concluding the Plaintiff would be able to understand,

remember, and follow simple instructions in order to complete a basic task; require the use of

external memory aids; require increased supervision; be able to maintain and concentration to

complete a basic task; require increased supervision for redirection and an environment free of

distraction, if he demonstrated an increase in skills; be able to relate to others on a simple level

only; be able to complete simple, rote, and repetitive work tasks only; require additional time to

learn new tasks; and may benefit from assistance with fund management.  (R. at 762-763.)

10

C.     **Jackie B. Clark, MRC, CRC**

On July 29, 2013, Jackie B. Clark, MRC, CRC wrote a letter to the Madison County

Board of Disability Determination in support of Plaintiff's effort to be determined eligible for

services.  (R. at 853.)  Ms. Clark wrote that, as Plaintiff's vocational counselor for the previous

two years, she had "interacted with [Plaintiff] many times . . . and [was] afraid that without

significant long-term support[] [Plaintiff] will likely continue to struggle vocationally, socially,

and in living independently." (*Id.*)  Ms. Clark credited Plaintiff's late mother and his sister for

his progress, and opined that "I honestly don't think [Plaintiff] is aware of how much support he

gets, and how much he will need, especially in order to work and live independently."  (*Id.*)  Ms.

Clark also noted that "[t]he last job [Plaintiff] obtained was with significant help from a vendor

BVR hired to provide placement services," and added that "[e]ven with a great deal of job

coaching and communication with the employer, [Plaintiff] wasn't able to keep this job for more

than a few months."  (*Id.*)  Ms. Clark also wrote that Plaintiff's "decision-making is such that I

question how safe he would be in caring for his personal needs and living on his own."  (*Id.*)

D.     **State Agency Consultants**

State Agency consultant Diane Manos, M.D., reviewed Plaintiff's file at the initial level

on August 26, 2012, and provided assessments of Plaintiff's physical residual functional capacity

("RFC").  (R. at 70-83.)  Specifically, Dr. Manos found that Plaintiff could occasionally lift

and/or carry up to 20 pounds; frequently lift and/or carry 10 pounds; stand and/or walk (with

normal breaks) for about six hours in an eight-hour workday; sit (with normal breaks) for about

six hours in an eight-hour workday; was otherwise unlimited in her ability to push and/or pull

(including operation of hand and/or foot controls); was occasionally limited in climbing

11

ramps/stairs and climbing ladders/ropes/scaffolds; and was frequently limited in her balancing, stooping (i.e., bending at the waist), kneeling, and crouching (i.e., bending at the knees).  (R. at 77-78.)  Dr. Manos found that Plaintiff had no manipulative, visual, communicative, or environmental limitations, and noted that Plaintiff "would probably do best with intermittent type activities throughout the day."  (R. at 78.)

Dr. Manos also reviewed a mental RFC provided by Aracelis Rivera, Psy.D.  (R. at 78-80.)  Dr. Rivera found that Plaintiff "would be able to understand, remember and follow simple instructions in order complete a basic task," but "[h]e would require the use of external memory aids and increased supervision" as well as "additional time to learn new tasks."  (R. at 79.)  Dr. Rivera found that Plaintiff was moderately limited in his ability to carry out very short and simple instructions, his ability to carry out detailed instructions, his ability to maintain attention and concentration for extended periods, his ability to sustain an ordinary routine without special supervision, his ability to make simple work-related decisions, and his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  (*Id.*)  Dr. Rivera also found that Plaintiff was not significantly limited in his ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerates, or his ability to work in coordination with or in proximity to others without being distracted by them.  (*Id.*)  Dr. Rivera concluded that Plaintiff "can perform [simple routine tasks, between one and three steps] in [a] work [setting] where a [coworker] is available to occasionally explain tasks and redirect."  (*Id.*)

Dr. Rivera also found that Plaintiff's social functioning was moderately limited with regard to his ability to interact appropriate with the general public, his ability to accept instructions and respond appropriately to criticism from supervisors, and his ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; but he was not significantly limited in his ability to ask simple questions or request assistance, or in his ability to maintain socially acceptable behavior and to adhere to basic standards of neatness and cleanliness.  (R. at 80.)  Dr. Rivera concluded that Plaintiff was "unsophisticated," and although he is able to relate satisfactorily to others, he would have difficulty performing tasks involving problem solving, such as customer service tasks.  (*Id.*)  Finally, Dr. Rivera noted that Plaintiff "would have difficulty adjusting to frequent changes in the job setting or work routine, but [he] should be capable of performing tasks in a relatively static environment."  (*Id.*)

Dr. Manos ultimately concluded that Plaintiff was not disabled, with the following explanation:

> You said you were disabled due to Bergers disease, sleep apnea, depression, mental health issues, obesity, hypertension, and ADD. The available medical evidence in your case shows that your medical and psychological impairments limit your ability to perform some types of work-related activity. However, you should still be capable of performing simple, repetitive tasks which do not require heavy lifting, frequent climbing, or frequent interactions with others. We do not have sufficient vocational information to determine whether you can perform any of your past relevant work.  However, based on the evidence in the file, we have determined that you can adjust to other work.

(R. at 82.)

On December 14, 2012, State Agency consultant Elaine M. Lewis, M.D. reviewed Plaintiff's file at the reconsideration level and agreed with Dr. Manos' above assessments.  (R. at 100-113.)  Dr. Lewis also reviewed a Mental RFC provided by Mary K. Hill, Ph.D., which

aligned with Dr. Rivera's above assessments.  (R. at 109-111.)  Dr. Lewis then also concluded

that Plaintiff was not disabled, and provided following explanation:

> You said you were disabled due to Bergers disease, sleep apnea, depression, mental
> health issues, obesity, hypertension, and ADD. You have filed for reconsideration
> of the initial decision made on your disability claim. We have reviewed the medical
> evidence and it does reveal that you have certain limitatinos in your ability to work.
> Your conditions do not meet the criteria for Social Security disability. We do not
> have sufficient vocational information to determine whether you can perform any
> of your past relevant work. However, based on the evidence in file, we have
> determined that you can adjust to other work. We are unable to find you disabled.

(R. at 112-113.)

## IV.  ADMINISTRATIVE DECISION

On February 27, 2020, the ALJ issued his decision which is at issue before the Court.  (R.

at 912-945.)  At step one of the sequential evaluation process,[2] the ALJ found that Plaintiff did

not engage in any disqualifying substantial gainful activity from August 30, 2009, through

September 21, 2014, the alleged closed period of disability.  (R. at 919.)  At step two, the ALJ

---

[2] Social Security Regulations require ALJs to resolve a disability claim through a five-step
sequential evaluation of the evidence.  *See* 20 C.F.R. § 416.920(a)(4).  Although a dispositive
finding at any step terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th
Cir. 2007), if fully considered, the sequential review considers and answers five questions:

1.  Is the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the
    criteria of an impairment set forth in the Commissioner's Listing of Impairments,
    20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity, can the claimant
    perform his or her past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual
    functional capacity, can the claimant perform other work available in the national
    economy?

*See* 20 C.F.R. § 416.920(a)(4); *see also Henley v. Astrue*, 573 F.3d 263, 264 (6th Cir. 2009); *Foster
v. Halter*, 279 F.3d 348, 354 (6th Cir. 2001).

14

found that Plaintiff has the following severe impairments: Immunoglobulin (IgA) Nephropathy

(Berger's Disease); Obesity; a Depressive Disorder; Borderline Intellectual Functioning (BIF);

and ADHD. (*Id.*) The ALJ found that Plaintiff did not have an impairment or combination of

impairments that meets or medically equals the severity of one of the listed impairments in 20

C.F.R. Part 404, Subpart P, Appendix 1. (R. at 926.) Then, at step four of the sequential

process, the ALJ set forth Plaintiff's residual functional capacity ("RFC") as follows:

> After careful consideration of the entire record, the undersigned finds that the
> claimant has the residual functional capacity to perform light work as defined in 20
> CFR 404.1567(b) and 416.967(b) subject to the following limitations: (1)
> occasional crouching, crawling, kneeling, stooping, balancing, and climbing of
> ramps and stairs; (2) no climbing of ladders, ropes, and scaffolds; (3) no work
> around hazards such as unprotected heights or dangerous machinery; (4) limited to
> performing simple, repetitive tasks with an SVP of 1 or 2; (5) occasional superficial
> contact with coworkers and supervisors (superficial contact is defined as retaining
> the ability to receive simple instructions, ask simple questions, and receive
> performance appraisals, but as lacking the ability to engage in more complex social
> interactions, such as persuasion of other people or resolving interpersonal
> conflicts); (6) no public contact; (7) no fast paced production work or jobs that
> involve strict production quotas; (8) limited to performing jobs that involve very
> little, if any, change in the job duties or the work routine from one day to the next;
> and (9) limited to jobs that would require no more than fifth-grade reading skills
> and seventh grade math skills.

(R. at 928.) The ALJ concluded that Plaintiff's "medically determinable impairments could

reasonably be expected to cause the alleged symptoms; however, [Plaintiff's] statements

concerning the intensity, persistence and limiting effects of these symptoms are not fully

supported." (R. at 933.)

In reaching this conclusion, the ALJ carefully considered all of the evidence of record,

including thorough discussions of the opinions from each of Plaintiff's medical providers. (R. at

928-933.) First, the ALJ discussed the August 10, 2012 opinion of Robert Whitehead, M.D., a

non-treating physician. (R. at 928-929.) The ALJ afforded Dr. Whitehead's opinion "partial

15

weight," concluding that "[i]t appears that Dr. Whitehead gave outsized weight to the subjective complaints of [Plaintiff] (i.e. shortness of breath due to his obesity)," which the ALJ noted were "inconsistent with Dr. Whitehead's own notes indicating that [Plaintiff] walked with a normal gait using no assistive device with no noticeable shortness of breath, or difficulty during manual muscle testing." (R. at 929.) Next, the ALJ discussed the December 19, 2012 opinion of Paul Hogya, M.D., FACEP, another non-treating physician. (*Id.*) Dr. Hogya concluded that Plaintiff was physically capable of "medium" exertion, and the ALJ afforded this opinion "partial weight" because "based on [Plaintiff's] morbid obesity, [the ALJ] believes that limiting [Plaintiff] to light exertion, not medium exertion, is appropriate." (*Id.*) Next, the ALJ discussed the opinions of the state agency consultants, Diane Manos, M.D., and Elaine Lewis, M.D., which the ALJ found to be "substantially persuasive." (R. at 929-930.)

The ALJ then considered the opinions of Plaintiff's treating physician, Udayan Bhatt, M.D, which the ALJ largely disregarded for the following reasons:

> When evaluated under these guidelines, the opinion of treating physician Dr. Bhatt cannot be given controlling or even deferential weight (and is, in fact, entitled to very little weight). First, the undersigned recognizes the treating relationship between Dr. Bhatt and the claimant (22F/1). Second, treatment records supplied by Dr. Bhatt do not coincide with his pessimistic assessment of the claimant's physical functioning capabilities. For instance, treatment notes indicate that the claimant's Berger's Disease is adequately controlled with medication (15F/3, 23F/6, 34F/1). Further, during his assessment with Dr. Whitehead, the claimant stated, that Dr. Bhatt has placed no physical restriction on him (18F/2). Also, Dr. Bhatt's 2014 assessment is inconsistent with the fact that it was completed at a time when the claimant had in fact returned to full-time employment (where he still works).

(R. at 930-931.)

With regard to Plaintiff's alleged mental health impairments, the ALJ considered additional opinion evidence. (R. at 921-924.) First, the ALJ disregarded a December 8, 1994 opinion from Doris R. Dickson, Ph.D., a non-treating physician, because "[t]hough Dr.

16

Dickson tested and examined [Plaintiff], this assessment is so remote (1994) that it is of little to

no use in assessing [Plaintiff's] current [RFC]."  (R. at 921.)  The ALJ then considered the

December 2, 2010 opinion of Dr. Clark, affording it "little weight" for the following reasons:

> The undersigned assigns the opinion of Dr. Clark little weight. Dr. Clark based his
> opinion on his examination of the claimant, testing, and subjective input from the
> claimant's mother (13F). The claimant has returned to work without any special
> supervision (Hearing Notes). There is no indication of improvement in the
> claimant's memory or cognitive functioning, which would suggest that he needed
> a job coach between 2009-2014, but no longer needs one to work competitively.
> Dr. Clark appears to put outsized consideration in the claimant's mother's
> assessment of the claimant (13F/3, 8-9) even though the claimant and his mother
> argued over her injection into the examination, and it was generally acknowledged
> that the claimant has a poor relationship with his parents (13F/3, 10). Dr. Clark's
> opinion is inconsistent with treatment notes, which indicate the claimant's
> depression as being in remission, "pretty stable and improved" and doing well with
> treatment (15F/4, 27F/2, 30F/11). Further, the medical expert in this case saw no
> need for a job coach to work with the claimant (*inter alia* Summary of Testimony
> of Jeffery Andert, Ph.D.).

(R. at 921-922.)  The ALJ then reviewed Dr. Meyer's June 28, 2012 opinion, affording it "little

weight" for similar reasons.  (R. at 922.)  The ALJ then addressed the July 29, 2013 opinion of

Ms. Clark, Plaintiff's vocational counselor, affording it "little weight" for the following reasons:

> The undersigned assigns the opinion of Ms. Clark little weight. Ms. Clark based
> her opinion on her work with the claimant (24F). However, vocational counselors
> are not included among the acceptable sources of medical evidence defined in the
> regulations (20 CFR 404.1513 and 416.913). Therefore information provided by
> vocational counselors does not equal in probative value reports from those medical
> sources shown as being acceptable such as licensed psychologists (20 CFR
> 404.1513, 404.1527, 416.913 and 416.927). Further, both the findings of such
> acceptable medical sources, and the claimant's testimony in this case do not support
> the dismal picture painted by Ms. Clark. The claimant has returned to work without
> any special supervision (Hearing Notes). There is no indication of improvement in
> the claimant's memory or cognitive functioning, which would suggest that he
> needed a job coach between 2009-2014, but no longer needs one to work
> competitively. Treatment notes indicate the claimant's depression as being in
> remission, "pretty stable and improved" and doing well with treatment (15F/4,
> 27F/2, 30F/11). Further, the medical expert in this case saw no need for a job coach
> to work with the claimant (inter alia Summary of Testimony of Jeffery Andert,
> Ph.D.).

17

(R. at 922-923.)

The ALJ then considered the opinions of the State Agency psychologists, Drs. Rivera and Hill.  (R. at 923.)  The ALJ afforded their opinions "partial weight," but the ALJ noted that he "has adopted most of the suggested limitations" from their opinions.  (*Id.*)  The ALJ again noted, however, that their opinions were not consistent with the fact that Plaintiff worked during the requested closed period and has, since 2014, returned to full-time work without the aid of a job coach.  (*Id.*)  The last opinion the ALJ considered was that of Dr. Andert.  (R. at 924.)  The ALJ afforded Dr. Andert's opinion "substantial weight, but not great weight," noting that he "adopted most of the recommendations of Dr. Andert."  (*Id.*)  The ALJ specifically found that Dr. Andert's opinion that Plaintiff did not need special supervision "is consistent with [Plaintiff's] current work situation."  (*Id.*)

Finally, relying on testimony from the VE, the ALJ found that considering Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform, including:  routing clerk, merchandise marker; and mail clerk.  (R. at 934-935.)  The ALJ therefore concluded that Plaintiff was not disabled under the Social Security Act since the alleged date of onset on August 30, 2009.  (R. at 935.)

## V.  STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by

substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is

defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486

F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must

"'take into account whatever in the record fairly detracts from [the] weight'" of the

Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting

*Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial

evidence supports the ALJ's decision, this Court defers to that finding 'even if there is

substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley

v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d

270, 273 (6th Cir. 1997)).

Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision

of the Commissioner will not be upheld where the [Social Security Administration] fails to

follow its own regulations and where that error prejudices a claimant on the merits or deprives

the claimant of a substantial right.'"  *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of

Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI.  ANALYSIS

Plaintiff puts forth one assignment of error:  that the ALJ improperly discredited the

opinion evidence of record which documented Plaintiff's need for a job coach.  (ECF No. 17 at

PAGEID ## 1687-1694.)  Specifically, Plaintiff argues that by refusing to acknowledge the "vast

majority of opinion evidence" that "documented [Plaintiff's] need for a job coach," the ALJ

incorrectly concluded that Plaintiff's condition had not improved – which meant, to the ALJ, that Plaintiff was never disabled. (*Id.*) Plaintiff argues that "[t]he record clearly documents significant issues during the relevant time period that would prevent [Plaintiff] from sustaining work," but "[t]he ALJ did not account for these additional limitations because the ALJ believed that these more restrictive opinions were inconsistent with the fact that [Plaintiff] was currently working." (*Id.* at PAGEID # 1691.) Plaintiff cites the fact that Dr. Clark and Ms. Clark both noted that Plaintiff needed a job coach in order to progress to a point where he may be able to sustain full-time employment, and argues that Plaintiff's "continued use of a job coach was the reason for [Plaintiff's] eventual ability to sustain full-time employment." (*Id.* at PAGEID # 1962.) Plaintiff also argues that the ALJ purposefully classified Plaintiff's limitations in such a way "in order to get around the need for a job coach." (*Id.* at PAGEID ## 1693-1694.)

In response, the Commissioner argues that the ALJ "recognized the static nature of Plaintiff's mental impairments and upheld his findings with substantial evidence," and stresses that Plaintiff has failed to meet his burden of showing that his impairments were disabling between 2009 and 2014 but had improved such that he could begin working in September 2014. (*See generally* ECF No. 22.) The Commissioner argues that "[a]s the ALJ noted, the record demonstrated no intervening event that could have caused further decline in cognitive functioning," and submits that "Plaintiff simply summarizes the evidence that was most favorable to his claim and broadly concludes he must have been disabled." (*Id.* at PAGEID # 1711.) Given the unusual procedural history of this Social Security claim, the Commissioner states that "the ALJ benefitted from hindsight by having the opportunity to review Plaintiff's alleged period of disability in light of later evidence, but his advantage did not render his

analysis less reasonable." (*Id.* at APGEID # 1716.)  The Commissioner concludes that "Plaintiff begrudges the ALJ['s] hindsight but cannot cite to evidence contradicting the ALJ's conclusions or otherwise show that the ALJ's opinion analysis was inadequate or erroneous." (*Id.*)  Plaintiff did not file a Reply brief.  Accordingly, the matter is ripe for judicial review.

By attacking the ALJ's consideration of the opinion evidence, Plaintiff argues that the ALJ's decision, including the RFC set forth by the ALJ, is not supported by substantial evidence. As a preliminary matter, the determination of a claimant's RFC is an issue reserved to the Commissioner.  20 C.F.R. §§ 404.1527(d), 416.927(d).  Nevertheless, substantial evidence must support the Commissioner's RFC finding.  *Berry v. Astrue*, No. 1:08-cv-411, 2010 WL 3730983, at \*8 (S.D. Ohio June 18, 2010).  An ALJ must explain how the evidence supports the limitations that he or she sets forth in the claimant's RFC:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

S.S.R. 96-8p, 1996 WL 374184, at \*7 (internal footnote omitted).  The ALJ must also consider all medical opinions he or she receives in evaluating a claimant's case.  20 C.F.R. § 416.927(c).

Here, Plaintiff argues that the ALJ erred by not incorporating several medical opinions into the RFC.  Specifically, Plaintiff argues that Ms. Clark, Dr. Clark, and Dr. Meyer all documented "greater, work preclusive limitations," but "[t]he ALJ did not account for these limitations because the ALJ believed that these more restrictive opinions were inconsistent with

21

the fact that [Plaintiff] was currently working."  (ECF No. 17 at PAGEID ## 1688, 1691.)  As the Commissioner correctly points out, however, "[t]he ALJ was entitled to reject limitations not otherwise substantiated by the record."  (ECF No. 22 at PAGEID # 1715.)  Here, the Undersigned agrees, and finds that the ALJ did not err by discounting parts of the opinions at issue.

"[T]here is no regulatory requirement that an ALJ adopt every facet of a particular medical opinion in formulating an RFC, so long as the record as a whole supports the RFC actually determined by the ALJ, and she adequately explains her analysis in a manner sufficient to allow review." *Kincaid v. Comm'r of Soc. Sec.*, No. 1:16-CV-736, 2017 WL 9515966, at *3 (S.D. Ohio June 12, 2017), *report and recommendation adopted*, No. 1:16CV736, 2017 WL 4334194 (S.D. Ohio Sept. 30, 2017).  A disagreement with how the ALJ decided to weigh differing medical opinions "is clearly not a basis for . . . setting aside the ALJ's factual findings." *Id.* (citing *Mullins v. Sec'y of Health & Hum. Servs.*, 836 F.2d 980, 984 (6th Cir. 1987)).  Further, "[e]ven where an ALJ provides 'great weight' to an opinion, there is no requirement that an ALJ adopt a state agency [consultant's] opinions verbatim; nor is the ALJ required to adopt the state agency [consultant's] limitations wholesale." *Reeves v. Comm'r of Soc. Sec.*, 618 F. App'x 267, 275 (6th Cir. 2015) (citations omitted).

Here, the Undersigned finds that the ALJ's decision is supported by substantial evidence, including the ALJ's finding that Plaintiff did not need a job coach.  Throughout the ALJ's decision, the ALJ cited substantial evidence, including Plaintiff's own testimony and activities of daily living, and set forth multiple reasons why he believed Plaintiff did not need a job coach, including the following:  (1) "[t]here is no indication of improvement in [Plaintiff's] memory or

cognitive functioning, which would suggest that he needed a job coach between 2009-2014, but no longer needs one to work competitively"; (2) "the medical expert in this case saw no need for a job coach to work with the claimant"; and (3) the fact that Plaintiff "worked during the closed period requested, and has, since 2014, returned to full-time work without the aid of a job coach." (R. at 921-924.)

The ALJ's reasoning is supported by substantial evidence.  First, the Undersigned agrees that the record does not show any improvement in Plaintiff's memory or cognitive functioning after the alleged closed period ended.  Indeed, Plaintiff testified during the January 16, 2020 administrative hearing that he was working full-time and there had been no change to his mental health (compared to the alleged closed period) that allowed him to do that.  (R. at 981.)  The Undersigned also notes that Plaintiff does not identify *any* testing of Plaintiff's memory or cognitive functioning after the alleged closed period ended that would suggest that his ability to work without a job coach improved after the closed period ended.  Rather, Plaintiff relies exclusively on evidence from the alleged closed period – Dr. Clark's opinion was from 2010, Dr. Meyer's opinion was from 2012, and Ms. Clark's opinion was from 2013 – that could not consider or account for the fact that Plaintiff has since been able to work full-time without a job coach.

This Undersigned therefore agrees with the ALJ that Plaintiff essentially had the same level of cognitive impairment during and after the closed period, at least as it relates to Plaintiff's alleged need for a job coach.  In the absence of any evidence to show improvement in his conditions, it was reasonable for the ALJ to find that Plaintiff did not need a job coach.  *See Jackson v. Comm'r of Soc. Sec.*, No. 3:10-CV-6, 2011 WL 478906, at *4 (S.D. Ohio Feb. 7,

2011) (Where "Plaintiff essentially had the same level of impairment during and after the closed period," but "present[ed] essentially nothing to show improvement in these conditions that would make his testimony less applicable to his activities during the closed period," it was reasonable for the ALJ to discount Plaintiff's alleged impairments) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence); *see also Joyce v. Colvin*, No. 15-2718-DKV, 2016 WL 8678047, at *11 (W.D. Tenn. Apr. 15, 2016) ("Joyce essentially had the same level of mental impairment during and after the closed period. This evidence further supports a finding that Joyce was not disabled from June 15, 2007, his alleged onset date, until September 14, 2012.").

Additionally, the ALJ reasonably relied on the substantial evidence from Dr. Andert. Specifically, Dr. Andert testified that while "intermittent oversight by a supervisor maybe once or so over the course of an eight-hour shift" may be necessary, it was his opinion that Plaintiff did not need a job coach to provide any special supervision or help communicating with his employer.  (R. at 956-957.)  The ALJ correctly observed that Dr. Andert's testimony "is consistent with [Plaintiff's] current work situation," and assigned Dr. Andert's opinion substantial weight.  (R. at 924.)

In so finding, the Court is not ignoring the evidence cited by Plaintiff, nor is it suggesting that Plaintiff did not in fact benefit from the services provided by the BVR.  Regardless of whether Plaintiff's desired outcome could be supported by substantial evidence, it is the Court's responsibility to determine whether the ALJ's finding was supported by substantial evidence. Because it was in this case, the Court must defer to the ALJ's RFC.  *Nash v. Comm'r of Soc.*

*Sec.*, No. 19-6321, 2020 WL 6882255, at *4 (6th Cir. Aug. 10, 2020) ("Even if the record could support an opposite conclusion, we defer to the ALJ's finding because it is supported by substantial evidence, based on the record as a whole.") (internal citations omitted).

To be clear, an ALJ is not required to mirror or parrot medical opinions verbatim. *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 157 (6th Cir. 2009). While Plaintiff may have preferred a different RFC than the one determined by the ALJ, the ALJ thoroughly explained the bases for the RFC determination, including as it relates to Plaintiff's alleged need for a job coach, and the ALJ's explanation enjoys substantial support in the record. *Dickinson v. Comm'r of Soc. Sec.*, No. 2:19-CV-3670, 2020 WL 4333296, at *11 (S.D. Ohio July 28, 2020), *report and recommendation adopted*, No. 2:19-CV-3670, 2020 WL 5016823 (S.D. Ohio Aug. 25, 2020) (citing *Schmiedebusch v. Comm'r of Soc. Sec.*, 536 F. App'x 637, 649 (6th Cir. 2013). While Plaintiff may disagree with the ALJ's decision, his decision is clearly within the "zone of choices" afforded to him. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) ("The substantial evidence standard presupposes that there is a 'zone of choice' within which the Secretary may proceed without interference from the courts. If the Secretary's decision is supported by substantial evidence, a reviewing court must affirm.")). Under these circumstances, the Undersigned finds no merit to Plaintiff's statement of error.

For these reasons, it is **RECOMMENDED** that Plaintiff's contention of error be **OVERRULED**, and the Commissioner's decision be **AFFIRMED**.

## VII.  CONCLUSION

In sum, from a review of the record as a whole, the Undersigned concludes that substantial evidence supports the ALJ's decision denying benefits. Based on the foregoing, it is

25

therefore **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

<u>**PROCEDURE ON OBJECTIONS**</u>

If any party seeks review by the District Judge of this Report and Recommendation, that party may, within fourteen (14) days, file and serve on all parties objections to the Report and Recommendation, specifically designating this Report and Recommendation, and the part in question, as well as the basis for objection.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and Recommendation will result in a waiver of the right to *de novo* review by the District Judge and waiver of the right to appeal the judgment of the District Court.  *See, e.g.*, *Pfahler v. Nat'l Latex Prod. Co.*, 517 F.3d 816*,* 829 (6th Cir. 2007) (holding that "failure to object to the magistrate judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that defendant waived appeal of district court's denial of pretrial motion by failing to timely object to magistrate judge's report and recommendation).  Even when timely objections are filed, appellate review of issues not raised in those objections is waived.  *Robert v. Tesson*, 507 F.3d 981, 994 (6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).


**Date: August 4, 2021**                    **/s/** *Elizabeth A. Preston Deavers*
                                            **ELIZABETH A. PRESTON DEAVERS**
                                            **UNITED STATES MAGISTRATE JUDGE**

26